**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EDGEBROOK BANK, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-2759 |
| | ) | |
| v. | ) | Honorable Joan B. Gottschall |
| | ) | |
| FEDERAL DEPOSIT INSURANCE | ) | Magistrate Judge Sheila Finnegan |
| CORPORATION, | ) | |
| | ) | FILED UNDER SEAL |
| Defendant. | ) | |
| | ) | |

**DEFENDANT FEDERAL DEPOSIT INSURANCE
CORPORATION'S RESPONSE TO PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

Introduction ................................................................................................................ 1

Statement of Facts ..................................................................................................... 4

    The Bank's Recent Supervisory History .............................................................. 4

        Deficient Lending Practices ............................................................................ 5

        Failure to Accurately Report Financial Condition ....................................... 8

    2015 – The Bank Continues Its Hazardous Lending and Regulatory Violations ....... 9

Argument .................................................................................................................. 13

I.     The Bank Has Not Established That It Is Entitled To Injunctive Relief ............... 13

    A.     The Governing Standard ................................................................... 13

    B.     The Bank Has Not Established a Likelihood of Success on the Merits ...... 14

    C.     The Bank Has Not Established That Continued Compliance with the Temporary C&D Order Will Cause It Irreparable Harm ........................ 15

    D.     The Balance of Harms Favors Denial Of Injunctive Relief ........................ 18

Conclusion ............................................................................................................... 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796 (7th Cir. 2002) .................................... 13

*Boberski v. Ryan*, 793 F. Supp. 170 (N.D. Ill. 1992)..................................................................... 14

*City of Los Angeles v. Lyons*, 461 U.S. 95, (1983) ........................................................................ 16

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 919 F. Supp. 1 (D.D.C. 1994)...................... 18

*Ditton v. Rusch*, No. 14 C 3260, 2014 WL 4435928 (N.D. Ill. Sept. 9, 2014) (Lee, J.).............. 16

*Hamilton Bank, N.A. v. Office of the Comptroller of the Currency*, 227 F. Supp. 2d
    1 (D.D.C. 2001) ....................................................................................................... 14, 18

*Khalik v. United States Dep't of Agric.*, No. 94 C 5809, 1994 WL 548213 (N.D. Ill.
    Oct. 5, 1994) (Holderman, J.) ........................................................................................ 17

*Parker v. Ryan*, 959 F.2d 579 (5th Cir. 1992) .............................................................................. 14

*Ping v. National Educ. Ass'n*, 870 F.2d 1369 (7th Cir. 1989) ...................................................... 15

*Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, No. 15 C 551,
    2015 WL 739140,  (N.D. Ill. Feb. 19, 2015) ...................................................... 13, 17

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008). ............................................................. 13

**Statutes**

12 U.S.C. § 1818(b) ........................................................................................................................ 1

12 U.S.C. § 1818(b)(1). ............................................................................................................... 1, 2

12 U.S.C. § 1818(c)(1),................................................................................................................... 2

12 U.S.C. § 1831o............................................................................................................................ 3

**Introduction**

The FDIC is the primary federal regulator of Edgebrook Bank (the "Bank") and, in that capacity, conducts risk management examinations of the Bank to assess its safety and soundness. Based on those examinations, the FDIC concluded that the Bank has engaged in unsafe or unsound banking practices and violations of law, rules or regulations. Accordingly, on March 19, 2015 the FDIC served the Bank with a Notice of Charges and Hearing (the "Notice of Charges"), thereby instituting an administrative proceeding to determine whether an Order to Cease and Desist should issue against the Bank pursuant to section 8(b) of the Federal Deposit Insurance Act (the "FDI Act"), 12 U.S.C. § 1818(b) (the "8(b) Proceeding"). Section 8(b) of the FDI Act provides in relevant part that "[i]f, in the opinion of the [FDIC], any insured depository institution . . . is engaging or has engaged, or the agency has reasonable cause to believe that the depository institution . . . is about to engage, in an unsafe or unsound practice in conducting the business of such depository institution, or is violating or has violated, or the agency has reasonable cause to believe that the depository institution . . . is about to violate, a law, rule, or regulation . . . or any written agreement entered into with the agency," the FDIC may commence administrative proceedings to determine whether an order should issue "requir[ing] the depository institution . . . to cease and desist from the same, and, further, to take affirmative action to correct the conditions resulting from any such violation or practice." 12 U.S.C. § 1818(b)(1).

The FDIC also determined that the Bank's ongoing improper conduct is likely to weaken the Bank's financial condition and prejudice the interest of depositors prior to completion of the 8(b) Proceeding. Therefore, together with the Notice of Charges, the FDIC served the Bank with a Temporary Order to Cease and Desist (the "Temporary C&D Order") and supporting Findings of Fact and Conclusions of Law ("Findings") pursuant to section 8(c) of the FDI Act, which

1

provides in relevant part that "[w]henever the [FDIC] shall determine that the violation or threatened violation or the unsafe or unsound practice or practices, specified in the notice of charges served upon the depository institution . . . pursuant to [§ 1818(b)(1)], or the continuation thereof, is likely to cause insolvency or significant dissipation of assets or earnings of the depository institution, or is likely to weaken the condition of the depository institution or otherwise prejudice the interests of its depositors prior to the completion of the proceedings conducted pursuant to [12 U.S.C. § 1818(b)(1)], the agency may issue a temporary order requiring the depository institution . . . to cease and desist from any such violation or practice and to take affirmative action to prevent or remedy such insolvency, dissipation, condition, or prejudice pending completion of such proceedings." 12 U.S.C. § 1818(c)(1).

The Temporary C&D Order requires the Bank to (a) obtain the FDIC's prior written approval before making loans, except under specified circumstances; (b) correct inaccurate Consolidated Reports of Condition and Income ("Call Reports") and file accurate Call Reports going forward; and (c) obtain the FDIC's prior written approval before engaging in any material transaction, such as asset sales. The Temporary C&D Order became effective upon service on the Bank.

On March 30, 2015, the Bank filed its Complaint for Injunctive Relief. The next day the Bank filed its Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion") asking this Court to enjoin the enforcement of, or limit, the Temporary C&D Order. Because the Bank cannot meet its burden of establishing that it is entitled to injunctive relief, its Motion should be denied.

First, the Bank is not likely to succeed on the merits of its claim that the FDIC lacked authority to issue the Temporary C&D Order. As set forth in the Findings and the verified

declarations submitted with this Response, the FDIC has established a *prima facie* case that the Bank has engaged in hazardous lending and other unsafe or unsound banking practices and that, absent the Temporary C&D Order, those practices will continue and weaken the Bank even further, to the detriment of its depositors.  Though the Bank asserts that it has mended its ways over the last several months, since February 2015 it has continued its course of unsafe or unsound conduct by, among other things, violating the restrictions placed on it as a critically undercapitalized institution under 12 U.S.C. § 1831o and making an unsecured interest-only loan to an adversely classified borrower.

Second, the Bank has not established that it will be irreparably harmed if the Temporary C&D Order is not enjoined.  The Bank speculates that it may be injured in two ways – the FDIC may use its compliance with the Temporary C&D Order to argue that the Bank has waived its position on certain issues in the 8(b) Proceeding, and the FDIC may sit on or unreasonably refuse to consent to the Bank's requests to make loans or engage in material transactions.  The Bank's speculation is baseless.  The FDIC has advised the Bank that it will not contend that the Bank waived any arguments in the 8(b) Proceeding by complying with the Temporary C&D Order.

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████  The Bank's continued inability to adequately support its lending decisions further demonstrates that any harm it suffers is self-inflicted.

Third, even if the Bank could establish a likelihood of success and irreparable injury, the balance of harms weighs against injunctive relief.  Enabling the Bank to continue its hazardous lending and violation of the restrictions placed on it as a Critically Undercapitalized institution during the pendency of the 8(b) Proceeding will only make it more difficult for the Bank to avoid

failure – failure that would harm the Bank's depositors and may diminish the Deposit Insurance Fund.

## Statement of Facts

The Bank is a state-chartered bank with its principal place of business in Chicago, Illinois. The Bank's primary regulators are the Illinois Department of Financial and Professional Regulation, Division of Banking (the "Division") and the FDIC.

The FDIC conducts comprehensive safety and soundness examinations of the banks that it regulates. These examinations enhance the FDIC's ability to maintain public confidence in financial institutions and the banking system. During the course of a bank examination, a team of examiners reviews a bank's books and records and interacts with the bank's senior management and directors to determine a bank's risk profile. Accordingly, it is essential that examiners have access to all records and employees of a bank during an examination. Declaration of David A. Van Vickle ("Van Vickle Decl.", attached hereto as Exhibit A) at ¶ 6.

In evaluating a bank's safety and soundness, examiners review five components of risk: Capital, Asset Quality, Management, Earnings, Liquidity and Sensitivity to Market Risk. The examiners assign numerical ratings for each component from 1 to 5, with 1 being the highest rating and 5 being the lowest rating. The examiners also assign a composite rating from 1 to 5. The composite and component ratings are known as CAMELS ratings (an acronym derived from the names of the components). Van Vickle Decl. at ¶ 6.

**The Bank's Recent Supervisory History**

Since May 31, 2012, the Bank has operated subject to a Consent Order issued by the Division and the FDIC. Van Vickle Decl. at ¶ 8 & Ex. 1. Pursuant to that Consent Order, by June 30, 2012, the Bank agreed to have and maintain a capital ratio of at least 9% and a total risk

4

based capital ratio of at least 13%. Van Vickle Decl. at Ex. 1, ¶ 4. The Bank also agreed to take numerous steps to address deficiencies in its lending practices, including the removal of all lending authority from John Ptak, the Bank's former President (and the declarant in support of the Bank's Motion). *Id.* at ¶ 1(c).

The FDIC and the Division last conducted a full-scope examination of the Bank in April 2014, and subsequently conducted visitations in November 2014 and February 2015. Declaration of James A. Boudreau ("Boudreau Decl.", attached hereto as Exhibit B) at ¶ 8. Following the February 2015 Visitation, the Bank's CAMELS ratings are ███████████████ ████████████████████████████████████████████████ ███████████████████████ Van Vickle Decl. at ¶ 10.

**Deficient Lending Practices**

As a result of the 2014 Examination, November 2014 Visitation and February 2015 Visitation, the FDIC has concluded that the Bank's lending function has become severely impaired through a combination of hazardous lending practices and deficiencies in both credit risk assessment and underwriting. The Bank is lending to borrowers who have not demonstrated the capability to repay loans, resulting in a large number of non-performing assets and adversely classified assets. Boudreau Decl. at ¶ 10.

The Bank's hazardous lending practices noted during the recent examination period include:

(a)     disbursing draws on construction loans directly to borrowers without obtaining supporting invoices for the draws or waivers of any third-party liens, or without using third-party inspectors;

(b)      disbursing funds directly to borrowers to pay back taxes on collateral with no safeguards to insure the taxes are paid;

(c)      closing loans without clearing title exceptions;

(d)      paying off third-party liens in excess of the amount set forth in the title commitment without obtaining appropriate documentation for the increased amount;

(e)      lacking an established procedure for ordering or tracking orders for appraisals;

(f)      making new loans to classified borrowers who have existing problem loans with the Bank;

(g)      masking its true financial condition by making new loans with terms unfavorable to the Bank in order to refinance troubled borrowers;

(h)      assessing credit risk and approving loans based on non-existent or inadequate financial information from borrowers and guarantors, such as incomplete, unsigned personal financial statements and stale tax returns; and

(i)      failing to put loans into non-accrual status when full collection of principal and interest is in doubt, thereby overstating the Bank's income.

Boudreau Decl. at ¶¶ 11-12 & 21.

Specific examples of these unsafe and unsound practices include the following.



███████████████████████████████████████████████

██████████████████████████████████  ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████  ████████████████████████

███████████████████████████████████████████████

██████████████████████ Boudreau Decl. at ¶ 15.

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ Boudreau Decl. at ¶ 16.

████████████████████████████████████████████

███████████████████████████████████████  ████████

███████████████████████████████████████████████

███████████████████████████████████████████████



Boudreau Decl. at ¶ 17.

. Boudreau Decl. at ¶ 18.

**Failure to Accurately Report Financial Condition**

In addition to hazardous lending and related deficiencies, the Bank's failure to recognize problem assets, its deferral of loss, its failure to place loans in non-accrual status, and its failure to adequately fund its Allowance for Loan and Lease Losses ("ALLL") have caused the Bank to file inaccurate and misleading Consolidated Reports of Condition and Income ("Call Reports"). Boudreau Decl. at ¶ 22.

Every bank must maintain an ALLL adequate to absorb estimated credit losses associated with its loan and lease portfolio, that is, loans and leases that the bank has the intent and ability to hold for the foreseeable future or until maturity or payoff. Management should evaluate the adequacy of the ALLL on a quarterly basis, and appropriate provisions should be made. When the ALLL is deemed inadequate, management is required to increase the provision for loan and lease loss expense to restore the ALLL to an adequate level. Boudreau Decl. at ¶ 23.

Within thirty days of the end of a quarter, a Bank is required to file a Call Report, which must be completed in an accurate and consistent manner to reflect a fair presentation of the Bank's financial condition and results of operations. The FDIC uses Call Report data to monitor the condition, performance, and risk profile of individual banks and the banking industry as well as to calculate deposit insurance assessments. The public relies on Call Reports (which are available online) as a source of information about a bank's earnings, balance sheet, asset quality, liquidity, and capital levels. A Call Report is one of the best tools for the public to use in ascertaining the financial condition of banks. Boudreau Decl. at ¶¶ 27-28.



Van Vickle Decl. at ¶ 33.

**2015 – The Bank Continues Its Hazardous Lending and Regulatory Violations**

By letter dated February 10, 2015, the FDIC and the Division delivered their report of the November 2014 Visitation to the Bank. Van Vickle Decl. at ¶ 21 & Ex. 3.



Boudreau Decl., ¶ 19; Van Vickle Decl., ¶¶ 21-22.

Van Vickle Decl., ¶ 21.

By a separate letter dated February 10, 2015, the FDIC notified the Bank that it was critically undercapitalized and subject to the restrictions on critically undercapitalized institutions found in 12 C.F.R. § 325.105(a) and 12 U.S.C. § 1831o. The FDIC's letter identified the specific restrictions applicable to the Bank, including the prohibition on entering into any material transactions (expressing including asset sales) without the prior written approval of the FDIC. Boudreau Decl., ¶ 31 & Ex. 1.

During its February 2015 Visitation, which concluded on March 12, 2015, the FDIC discovered new examples of the Bank's continued hazardous lending and regulatory violations. Boudreau Decl. at ¶ 20.

First, the Bank had issued a new, unsecured interest-only loan to a borrower who already had past due loans at the Bank. The loan presentation was dated February 12, 2015 (two days after the Bank was advised of the findings from the November 2014 Visitation), and the entire

10

Board of Directors approved the loan on the same date.  Loan proceeds of $129,750 were wired to the borrower's deposit account at JP Morgan Chase, N.A. on February 12, 2015.  The borrower is part of a 9-loan relationship involving seven borrowers.  The entire loan relationship is adversely classified, and five of the nine loans within this loan relationship are more than 100 days past due, and all nine are past due, including outstanding loans to the borrower and a corporate entity of which the borrower is an owner and officer.  Boudreau Decl. at ¶ 14; Van Vickle Decl. at ¶ 17.

Second, on February 24, 2015 – two weeks after being advised that, because of the Bank's critically undercapitalized status, any asset sale required the FDIC's prior written consent – the Bank sold assets totaling approximately $1,600,000 without seeking or obtaining the FDIC's approval.  Boudreau Decl. at ¶ 32.

███████████████████████████████████████████████████████

███████████████████████████████  Accordingly, the FDIC was faced with the following:

(a)    the Bank's continued hazardous lending, which strongly suggested that additional lending presented impermissible risks to the Bank's capital, credit, funding, operations and reputation;

(b)    the Bank's violation of an express restriction on its activities by virtue of the FDIC's determination that it was critically undercapitalized;

(c)    the Bank's refusal to accurately calculate the ALLL and amend its Call Reports to reflect its true financial condition; and

(d)    the Bank's refusal to consent to measures intended to arrest the deterioration in its condition.

As a result, on March 18, 2015, the FDIC issued the Temporary C&D Order, carefully tailored to address the Bank's problems by requiring it to (a) obtain the FDIC's prior written approval before making loans, except under specified circumstances; (b) correct inaccurate Call Reports and file accurate Call Reports going forward; and (c) obtain the FDIC's prior written approval before engaging in any material transaction, such as asset sales.

By letter dated March 24, 2015, the FDIC and the Division delivered their report of the February 2015 Visitation to the Bank.  Van Vickle Decl. at ¶ 22 & Ex. 4.  █████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████  Boudreau Decl. at ¶ 20; Van Vickle Decl. at ¶ 22.

On March 28 and 30, 2015, pursuant to the Temporary C&D Order, the Bank requested that the FDIC consent to 11 proposed loan extensions, and on April 2 it requested consent to extend an additional 32 loans.  The FDIC responded in writing that same day, advising the Bank that █████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████  Van Vickle Decl. at ¶¶ 12-16 & Ex. 2.

## Argument

**I.  The Bank Has Not Established That It Is Entitled To Injunctive Relief.**

### A.  The Governing Standard

In its Motion, the Bank asks for both a temporary restraining order and preliminary injunction against enforcement of the Temporary C&D Order.  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.* at 22.  "The standard for the issuance of a TRO is the same as that required to issue a preliminary injunction."  *Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, No. 15 C 551, 2015 WL 739140, at *2 (N.D. Ill. Feb. 19, 2015) (Kendall, J.) (citations omitted).

"A party with no chance of success on the merits cannot attain a preliminary injunction. In the first phase of the analysis, the court decides only whether the plaintiff has any likelihood of success – in other words, a greater than negligible chance of winning – but in the second phase, the court evaluates that likelihood of success, as the analysis turns to a 'sliding scale' under which a lesser likelihood of success can be made sufficient by a greater predominance of the balance of harms."  *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002) (citations omitted).

**B.      The Bank Has Not Established a Likelihood of Success on the Merits**

With respect to temporary cease-and-desist orders, "judicial review is adequately carried out if the agency presents a *prima facie* case of illegality, based upon the agency's demonstrated compliance with its procedures and the statutory grounds for issuing a temporary order." *Parker v. Ryan*, 959 F.2d 579, 583 (5th Cir. 1992). "[A] *prima facie* case requires a verified statement of the specific facts giving rise to violations or improprieties . . . ." *Id.*; *accord Hamilton Bank, N.A. v. Office of the Comptroller of the Currency*, 227 F. Supp. 2d 1, 8 (D.D.C. 2001); *cf. Boberski v. Ryan*, 793 F. Supp. 170, 172-73 (N.D. Ill. 1992) (applying *Parker*'s *prima facie* standard to deny TRO against suspension order issued pursuant to 12 U.S.C. § 1818(e)(3)).

The Bank contends that it is likely to succeed on the merits because the record does not support the FDIC's determination that without the Temporary C&D Order, the Bank's condition likely would weaken, or its depositors would be prejudiced, during the pendency of the 8(b) Proceeding.  Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction ("Plaintiff's Memo.") at 14.  In particular, the Bank contends, the standard for issuance of a temporary cease-and-desist order is not met here because the Bank's "various conduct" described in the Notice of Charges is "primarily in the distant past". *Id.*

The Bank's argument is without merit.  The Findings issued in support of the Temporary C&D Order, together with the verified Boudreau and VanVickle Declarations, set forth a *prima facie* case that the Bank has engaged in a continuing course of hazardous lending and related violations of law as recently as February 2015, when it made an unsecured interest-only loan to a classified borrower and violated one of the express restrictions placed on it, as a critically undercapitalized institution, a mere two weeks after being advised of those restrictions.  The fact that several of the Bank's specific acts of misconduct occurred in 2014 (the so-called "distant

past") does not render unreasonable the FDIC's determination that, if the Bank's hazardous lending and violations are allowed to continue, the Bank's condition likely will be weakened and its depositors prejudiced before completion of the 8(b) Proceeding. Loan proceeds and other assets will leave the Bank with prospects of repayment uncertain at best, and depositors who review the Bank's Call Reports will not obtain an accurate description of the Bank's financial condition.

Moreover, since issuance of the Temporary C&D Order, the Bank's efforts to obtain the FDIC's consent to its lending decisions only confirm the FDIC's determination that immediate relief was necessary to stop the Bank's hazardous lending. ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

The Bank's inability to establish any likelihood of success on the merits requires that its Motion be denied. *See Ping v. National Educ. Ass'n*, 870 F.2d 1369, 1372 (7th Cir. 1989) (unnecessary to reach the sliding scale analysis because plaintiffs failed to meet threshold burden of showing some likelihood of success on the merits).

### C.     The Bank Has Not Established that Continued Compliance with the Temporary C&D Order Will Cause It Irreparable Harm

Even if the Bank had a greater than negligible chance of showing that issuance of the Temporary C&D Order was not warranted under 12 U.S.C. § 1818(c)(1), injunctive relief would be inappropriate because the Bank has not established that it will be irreparably injured by complying with the Temporary C&D Order during the pendency of the 8(b) Proceeding.

"The threat of irreparable injury necessary to justify the extraordinary remedy of preliminary injunctive relief must be 'real,' 'substantial,' and 'immediate,' not speculative or conjectural." *Ditton v. Rusch*, No. 14 C 3260, 2014 WL 4435928, at *3 (N.D. Ill. Sept. 9, 2014) (Lee, J.) (*citing City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). The two types of hypothetical harm asserted by the Bank do not meet this standard.

First, the Bank argues that if it amended its Call Reports in the manner directed by the Temporary C&D Order, "the FDIC and [Division] could attempt to argue [the Bank] had compromised its position as to its ALLL and capitalization figures and is therefore subject to automatic appointment of a receiver" under Section 38 of the FDI Act. Plaintiff's Memo. at 18-19. The Bank's speculation as to what the FDIC "could attempt to argue" not only is insufficient to establish irreparable injury, but also is factually incorrect. As the FDIC has advised the Bank, it will not contend in the 8(b) Proceeding that the Bank somehow voluntarily waived its position on the ALLL or capitalization issues by complying with the Temporary C&D Order. Any speculation as to what the Division might do is irrelevant because the FDIC, not the Division, makes determinations of "critically undercapitalized" status under the FDI Act.

Second, the Bank contends that, although the Temporary C&D Order allows it to engage in lending activity or material transactions with the FDIC's prior written consent, "[i]f such approvals are not timely reviewed or are unreasonably withheld, [the Bank] could be precluded from generating additional income for the entirety of the pendency of the [8(b) Proceeding], which would have severe negative consequences." Plaintiff's Memo. at 19.

The Bank's speculation as to what "could" happen presumes that the FDIC would act on the Bank's consent requests in bad faith, a presumption that has no support in the record.

16

The Ptak Declaration avers that the Bank generates approximately 75 new loans per year (an average of six per month) and has 74 existing loans "that will need to be renewed within the next three months." Plaintiff's Memo. at Ex. 1, ¶¶ 11-12. Mr. Ptak asserts that "[i]f the Bank is prevented from originating new loans in a customary and timely manner, or from renewing or extending the large volume of existing loans, the Bank's financial position will become imperiled", and that the Bank will suffer reputational damage and lose customer goodwill if unable to make, renew or extend loans. *Id.* at ¶¶ 13-15.) Mr. Ptak does not, however, identify any proposed new loans, renewals or extensions for which the Bank has requested the FDIC's consent, much less explain the status of those consent requests or why it would be unreasonable for the FDIC to withhold consent.[1] *See Right Field Rooftops, LLC*, 2015 WL 739140 at *5 ("A TRO that is seeking irreparable injury based on complete business collapse must support that conclusion with documentation." ); *see also Khalik v. United States Dep't of Agric.*, No. 94 C 5809, 1994 WL 548213, at *2 (N.D. Ill. Oct. 5, 1994) (Holderman, J.) (allegation of loss of business unsupported by financial records insufficient to establish irreparable harm).

Moreover, the parties' course of dealing since issuance of the Temporary C&D Order has confirmed the FDIC's willingness to consider the Bank's consent requests promptly and fairly. On March 28 the Bank requested that the FDIC consent to 11 proposed loan extensions, and on April 2 it requested consent to extend an additional 32 loans. The FDIC responded in writing on April 2, advising the Bank that ███████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████

---

[1]  Mr. Ptak would have no personal knowledge of the propriety of any request for consent, as his lending authority was removed pursuant to the Consent Order issued in 2012.

17

████████████████████████████████████████████ Since its April 2 response, the FDIC has not received any additional requests for consent, nor has the FDIC received the additional information that would enable it to evaluate the Bank's earlier requests.

The Bank has not demonstrated that the need to obtain FDIC approval of proposed loans or material transactions causes it real, substantial and immediate harm.

### D. The Balance of Harms Favors Denial of Injunctive Relief

As explained above, the Bank is not likely to succeed on the merits of its attack on the Temporary C&D Order and is not irreparably harmed by that Order. Even if the Bank had carried its burden of proving otherwise, the balance of harms does not favor enjoining the Temporary C&D Order.

According to the Bank, "neither the FDIC nor the public at large would [] suffer the slightest prejudice if the FDIC was simply made to wait until the completion of administrative proceedings to impose relief against [the Bank]." Plaintiff's Memo. at 20. The Bank is incorrect.

Depositors would suffer prejudice if the Bank were allowed to continue its hazardous lending and engage in material transactions that sent loan proceeds and other assets out of the Bank, with the prospect of repayment uncertain. The fact that the Bank's depositors would be reimbursed in the event of failure, up to the limits of federal deposit insurance, does not remove this prejudice as a consideration. *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 919 F. Supp. 1, 5-6 (D.D.C. 1994) (rejecting argument that depositors cannot be prejudiced after failure: "[T]he insurance fund now stands in the shoes of the depositors, and any action that would prejudice the depositors' interest now prejudices the insurance fund's interests."); *see also Hamilton Bank, N.A.*, 227 F. Supp. 2d at 16 (public interest favors denial of injunction against

temporary cease-and-desist order "where the OCC's primary justification for its actions rests on the assertion that it is endeavoring to protect members of the public as well as the funds in the public fisc from the harm they will suffer if Hamilton's alleged unsound practices cause the bank to fail.").

Moreover, members of the public who are doing, or considering doing, business with the Bank are prejudiced by the existence of Call Reports that do not present an accurate picture of the Bank's financial condition. Though the Bank insists that "there is no conceivable reason why [amending Call Reports] has to be done before the [8(b) Proceeding] is resolved", it ignores the fact that though the regulators and the Bank are well aware of its dire condition, the public is not, as bank supervisory information is generally kept confidential. Accordingly, a Call Report is one of the best tools for the public to ascertain the financial condition of banks.

## Conclusion

The FDIC has determined that the damage to the Bank's condition and the prejudice to depositors that would result from continuation of the Bank's unsafe and unsound practices and violations of law during the pendency of the 8(b) Proceeding warrant immediate relief in the form of the Temporary C&D Order. The FDIC seeks not to harm the Bank, but to stop the Bank from digging even deeper the hole in which it finds itself.

The Bank has failed to make a clear showing that this Court should suspend, set aside or limit the Temporary C&D Order. Accordingly, the Bank's Motion should be denied.

Dated: April 10, 2015                              Respectfully Submitted,

                                                   /s/*John W. Guarisco*_____
                                                   John W. Guarisco (#6229369)
                                                   Counsel
                                                   Federal Deposit Insurance Corporation
                                                   3501 Fairfax Drive, D-7056
                                                   Arlington, VA 22226

19

Tel.: 703.562.2077
Fax:  703.562.2481
jguarisco@fdic.gov

Larry L. Goodman – Virginia Bar No. 32621
Counsel
Federal Deposit Insurance Corporation
3501 Fairfax Drive, D-7040
Arlington, VA  22226
Tel.:  703.562.2385
Fax:  703.562.2477
lagoodman@fdic.gov

*Attorneys for Federal Deposit Insurance Corporation*

# EXHIBIT A

## DECLARATION OF DAVID A. VAN VICKLE

I, David A. Van Vickle, do hereby aver that:

1.      I have been employed by the Federal Deposit Insurance Corporation (FDIC) for 29 years.  From 1986 to May 1989, I was an Assistant Examiner (Trainee) in the risk management division, then known as the Division of Bank Supervision (DBS) in the Kansas City Regional Office.  I received my Commission as a Bank Examiner in 1989.  In 1989, I transferred to the Chicago North Field Office, Chicago Region, DBS, where I worked as a Commissioned Examiner from 1989 through 1991.  I transferred to the Chicago Region's Bath, Ohio Field Office and worked there from 1991 through 1996. I was a Case Manager in the Chicago Regional Office (CRO) from 1996 until 2002; I earned the Chicago Region Employee of the Year award in 1997.  From 2002 through 2006, I was a Regional Manager in the FDIC's Division of Insurance in the CRO.  I am currently an Assistant Regional Director in the CRO and have been so since 2006.  I earned the Chicago Region Manager of the Year award in 2013.  I report to Regional Director M. Anthony Lowe through the Deputy Regional Director.

2.      I received a Bachelor of Business Arts in Finance degree from Iowa State University, Ames, Iowa in 1985.  I completed a program at the Graduate School of Banking at the University of Wisconsin, Madison, Wisconsin in 2003.

3.      As an Assistant Regional Director (ARD) in the FDIC's Chicago Region, I oversee the risk supervision programs for all insured institutions headquartered in the greater Chicago metropolitan area.  I am responsible for ensuring the safety and soundness of those institutions by identifying, monitoring, and mitigating the various risks to which these institutions are exposed.

4.     I also coordinate the sharing of information with the Illinois Department of Financial and Professional Regulation, Division of Banking, regarding joint examinations of banks. I have personal knowledge of the facts set forth in this Declaration.

5.     I have a thorough knowledge and understanding of the FDIC's rules and regulations, financial institution letters, policies and guidance applicable to banks, including the Interagency Guidelines Establishing Standards for Safety and Soundness, 12 C.F.R. Pt. 364, App. A (Safety and Soundness Guidelines).

6.     Comprehensive bank examinations enhance the FDIC's ability to maintain public confidence in financial institutions and the banking system. Given the fundamental reasons for conducting examinations, regulatory personnel must have access to all records and employees of a bank during an examination. During the course of a bank examination a team of examiners review a bank's books and records and interact with the bank's senior management and directors to determine a bank's risk profile. The component ratings reflect the bank's capital adequacy, asset quality, management capabilities, earnings sufficiency, liquidity position, and sensitivity to market risk (commonly referred to as CAMELS ratings). When assigning ratings, examiners consider the bank's size and sophistication, the nature and complexity of its activities, and its general risk profile. Composite and component ratings are assigned based on a numerical scale from 1 to 5, with 1 indicating the highest rating, strongest performance and risk management practices, and least degree of supervisory concern. A 5 rating indicates the lowest rating, weakest performance and risk management practices.

2

7.     As ARD, I have overseen all of the FDIC's Safety and Soundness examinations of Edgebrook Bank, Chicago, Illinois (Bank) beginning with the December 2009 examination to present.  In addition to the five full scope examinations, FDIC examiners have returned to the Bank for targeted visitations three times since 2013.  I have also met with Bank management on numerous occasions and performed various other supervisory duties related to the Bank.

8.     The Bank is currently operating under a Consent Order issued pursuant to 12 U.S.C § 1818(b) since May 31, 2012.  However, subsequent unsafe or unsound practices and violations of law rule or regulation have occurred requiring additional remedial action.  A copy of the Consent Order is attached hereto as Exhibit 1.

9.     The Bank does not operate as a typical community bank with a primary focus on traditional lending products such as residential mortgages and business loans. Instead, this Bank engages in high-risk lending with concentrations in the hospitality industry, (restaurants, bars, and special event venues), commercial real estate, and construction.

10.    Examiners recently conducted a visit that began in February 2015, the focus of which was ████████████████████████ ████████████████████████████ ████████████████████████ ████████████████████████ ████  ████████████████████ ██████████████████████ ██████████████████████

11.    The Bank's Tier One Capital ratio as of the 2015 Visitation is ███████

████████████████████████████████████████████████████████████

12.    Recently, on March 28 and March 30, 2015, Ptak sent an email to Case Manager John Mielecki and me requesting a review and approval of loan extensions for 11 lending relationships at the Bank.  On April 2, 2015, bank counsel Robert Michels sent an email request to FDIC counsel John Guarisco requesting 90-day extensions on 32 additional loans.  These extension requests were made pursuant to the requirements set out in the March 18, 2015 Temporary Cease and Desist Order (Temporary Order).  ██

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████ A copy of the FDIC April 2, 2015 response is attached hereto as Exhibit 2.

13.  ██████████████████████████████████

████████████████████████████████████

███████████████████████████████

█████████████████████

14.     The FDIC is prepared to respond in a prompt manner to the Bank's lending requests as required by the Temporary Order.  However, the Bank must supply sufficient information in support of the lending requests in order for the FDIC to properly evaluate the requests.  The Bank's requests should include the specific rationale underlying the lending request and why the FDIC should approve the Bank's request for extensions of credit of any type.  Each request should clearly indicate that the Board of Directors has approved the recommendation by signing loan presentation forms prior to submitting the request to the FDIC.

15.     Extensions or renewals of existing loans are acceptable when based on recent, satisfactory performance and documented ability to pay, and when structured in accordance with the purpose of the credit.  Additionally, extensions should be presented to and voted on by the Bank Board of Directors in the same manner as new loans.

16.     ███████████████████████████████
████████████████████████████████████████████
███████████████████████████

17.     Examiners have confirmed that the Bank has a new unsecured interest-only loan to classified borrower ███████████ The loan presentation is dated February 12, 2015, and the entire board of directors approved the loan on the same date.  All loan proceeds, $129,750, were wired to the borrower's deposit account at JP Morgan Chase, N.A. on February 12, 2015.  Borrower ███████ is part of a 9-loan relationship with several borrowers.  The entire loan relationship is adversely classified.  At the time of this new $130,000 loan, most loans within this loan relationship were significantly past due at more than 100 days, including outstanding loans to ████████ ██████ and ██████ ████████████, a corporate entity of which ███████ is an owner and officer.

18.     ███████████████████████████████
████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████

19.     ███████████████████████████████
█████████████████████████████████████████
█████████████████████████████████
████████

20.     Examiners conducted a November 2014 Visit at the Bank, which was to assess the condition of the Bank. ████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████████████
████████ ████████████████████████████████
████████████████ ████████████████████████
████████████████████████████████████████
████████████████████ ████████████████████████ ████████
████████

21.     During the November 2014 Visitation, Examiners also noted that ████
███████████████████████████████████████████████
██████████████████████████████████████ ██████
███████████████████████████████████████████████
████████ ████████████████████████████████
███████████████████████████████████████ The findings of the Visitation were communicated to the Bank in a letter dated February 10, 2015 a copy of which is attached hereto as Exhibit 3. ████████████████████
████████████████████████████████████

22.     Identical concerns were still evident at the February Visitation.
████████████████████████████████ ████████ ████████
████ ███████████████████████████████████████
█████████████████████████████████████████████



████████████████████████████████████████ ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████  The findings of the February Visitation were communicated to

the Bank in a letter dated March 24, 2015 a copy of which is attached hereto as Exhibit 4.

23.  ███████████████████████████████ ████

██████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████

24.  █████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████ █████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████

25.  █████████████████████████████████ ██████ ███

████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████



26.

27.

28.



29.

30.

████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

██ ███████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████

     31.      In addition to hazardous lending and related deficiencies, the Bank's failure to recognize problem assets, deferral of loss, failure to place loans in non-accrual status, and failure to adequately fund its ALLL has caused the Bank to file inaccurate and misleading Consolidated Reports of Condition and Income (Call Reports).

     32.      All banks must maintain an ALLL adequate to absorb estimated credit losses associated with their loan and lease portfolio, that is, loans and leases that the bank has the intent and ability to hold for the foreseeable future or until maturity or payoff. Management must evaluate the adequacy of the ALLL on a quarterly basis, and appropriate provisions should be made.  When an ALLL is deemed inadequate,

management is required to increase the provision for loan and lease loss expense to
restore the ALLL to an adequate level.

33. 

34. The Bank's Call Reports must be completed in an accurate and consistent
manner to reflect a fair presentation of the Bank's financial condition and results of
operations. The FDIC uses Call Report data to monitor the condition, performance, and
risk profile of individual banks and the banking industry as well as to calculate deposit
insurance assessments. The public relies on Call Reports as a source of information
about a bank's earnings, balance sheet, asset quality, liquidity, and capital levels. A Call
Report is one of the best tools for the public to ascertain the financial condition of banks.

35. 

36.

████████████████████████████████

████████████████████████████████

███████████████████████████

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 10, 2015.

*David A. Van Vickle*

David A. Van Vickle
Assistant Regional Director

# EXHIBIT 1

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

AND

STATE OF ILLINOIS

DEPARTMENT OF FINANCIAL AND PROFESSIONAL REGULATION

DIVISION OF BANKING

SPRINGFIELD, ILLINOIS

| | | |
|---|---|---|
| In the Matter of | ) | CONSENT ORDER |
| | ) | |
| EDGEBROOK BANK | ) | FDIC-11-411b |
| CHICAGO, ILLINOIS | ) | 2011-DB-56 |
| | ) | |
| (State Chartered | ) | |
|     Insured Nonmember Bank) | ) | |

Edgebrook Bank, Chicago, Illinois ("Bank"), having been advised of its right to a NOTICE OF CHARGES AND OF HEARING detailing the unsafe or unsound banking practices alleged to have been committed by the Bank, and of its right to a hearing on the charges under section 8(b) of the Federal Deposit Insurance Act ("Act"), 12 U.S.C. § 1818(b), and under 38 Ill. Adm. Code, Section 392 et seq., regarding hearings before the Illinois Department of Financial and Professional Regulation, the Division of Banking ("Division"), and having waived those rights, by and through its duly elected and acting Board of

1

Directors ("Board") entered into a STIPULATION AND CONSENT TO THE ISSUANCE OF A CONSENT ORDER ("STIPULATION") with representatives of the Federal Deposit Insurance Corporation ("FDIC") and the Division, dated May 31, 2012, whereby, solely for the purpose of this proceeding and without admitting or denying the charges of unsafe or unsound banking practices relating to weaknesses in capital, asset quality, and liquidity, the Bank consented to the issuance of a CONSENT ORDER ("ORDER") by the FDIC and the Division.

The FDIC and the Division considered the matter and determined to accept the STIPULATION.

Having also determined that the requirements for issuance of an order under 12 U.S.C. § 1818(b) and section 48(6) of the Illinois Banking Act, 205 ILCS 5/48(6) have been satisfied, the FDIC and the Division HEREBY ORDER, that the Bank, its institution-affiliated parties, as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), and its successors and assigns take affirmative action as follows:

<u>MANAGEMENT</u>

1. (a) During the life of this ORDER, the Bank shall have and retain qualified management, including a Chief Credit Officer and appropriate numbers and types of senior loan officers with proven ability in upgrading a low quality loan portfolio. Each member of management shall have the

2

qualifications and experience commensurate with his or her duties and responsibilities at the Bank.  Management shall be provided the necessary written authority to implement the provisions of this ORDER.

   (b)  The qualifications of management shall be assessed on its ability to:

   (i)  Comply with the requirements of this ORDER;

   (ii)  Operate the Bank in a safe and sound manner;

   (iii)  Comply with applicable laws, rules, and regulations;

   (iv)  Comply with the Bank's approved policies and procedures; and

   (v)  Restore all aspects of the Bank to a safe and sound condition, including capital adequacy, asset quality, management effectiveness, earnings, liquidity, and sensitivity to interest rate risk.

   (c)  As of the effective date of this ORDER, the Bank shall remove all lending authority from the current President of the Bank.  For purposes of this paragraph, lending authority includes, but is not limited to, authority to make, renew, negotiate terms and conditions, or release, substitution, or

3

accept collateral for any loan, overdraft, or other extension of credit, either in his capacity as President, as a member of the board of directors, or as a member of any committee of the board of directors.

(d) During the life of this ORDER, prior to the addition of any individual to the board of directors or the employment of any individual as a senior executive officer, the Bank shall request and obtain the Division's written approval. For purposes of this ORDER, "senior executive officer" is defined as in section 32 of the Act ("section 32"), 12 U.S.C. § 1831(i), and section 303.101(b) of the FDIC Rules and Regulations, 12 C.F.R. § 303.101(b).

MANAGEMENT PLAN

2. (a) Within thirty (30) days from the effective date of this ORDER, the Bank shall retain an independent third party acceptable to the Regional Director and the Division, who will develop a written analysis and assessment of the Bank's management needs ("Management Study") for the purpose of providing qualified management for the Bank.

(b) The Bank shall provide the Regional Director and the Division with a copy of the proposed engagement letter or contract with the independent third party for review.

(c)   The Management Study shall be completed within ninety (90) days from the effective date of this ORDER.   The Management Study shall include, at a minimum:

(i)   identification of both the type and number of officer positions needed to properly manage and supervise the affairs of the Bank;

(ii)   identification and establishment of such Bank committees as are needed to provide guidance and oversight to active management;

(iii) evaluation of all Bank officers and senior staff members to determine whether these individuals possess the ability, experience and other qualifications required to perform present and anticipated duties, including adherence to the Bank's established policies and practices, and restoration and maintenance of the Bank in a safe and sound condition;

(iv) evaluation of all Bank officers' compensation, including salaries, director fees, and other benefits; and

> > (v)    a plan to recruit and hire any additional
> > or replacement personnel with the requisite
> > ability, experience and other
> > qualifications to fill those officer or
> > staff member positions identified by this
> > paragraph of this ORDER.

(d)   The Bank shall formulate a plan to implement the recommendations of the Management Study ("Management Plan") and implement the Management Plan within thirty (30) days of the completion of the Management Study.

(e)   A copy of the plan required by this paragraph shall be submitted to the Regional Director and the Division.

<u>BOARD PARTICIPATION</u>

3.   (a)   As of the effective date of this ORDER, the board of directors shall increase its participation in the affairs of the Bank, assuming full responsibility for the approval of sound policies and objectives and for the supervision of all of the Bank's activities, consistent with the role and expertise commonly expected for directors of banks of comparable size.  This participation shall include meetings to be held no less frequently than monthly at which, at a minimum, the following areas shall be reviewed and approved: reports of income and expenses; loan reports including new, overdue, renewed, extended, restructured, insider, non-accrual,

6

charged off, and recovered loans; investment activity; asset/liability and funds management reports; operating policies; personnel actions; and audit and supervisory reports. Board minutes shall document these reviews and approvals, including the names of any dissenting directors.

(b) As of the effective date of this ORDER, the board of directors shall ensure that complete and accurate minutes of the Board and committee meetings are maintained, including documentation of the areas reviewed and approved and names of any dissenting directors and that the minutes adequately address the areas covered in this ORDER. The board of directors shall ensure that management reports are sufficient to provide the Board with timely and adequate information necessary for making business decisions on the basis of fully informed and meaningful deliberation.

(c) Within 30 days from the effective date of this ORDER, the Bank's board of directors shall have in place a program that will provide for monitoring of the Bank's compliance with this ORDER.

<u>CAPITAL</u>

4. (a) By June 30, 2012, the Bank shall have and maintain its level of Tier 1 capital as a percentage of its total assets ("capital ratio") at a minimum of nine percent (9%) and its level of qualifying total capital as a percentage

7

of risk-weighted assets ("total risk based capital ratio") at a minimum of thirteen percent (13%). For purposes of this ORDER, Tier 1 capital, qualifying total capital, total assets, and risk-weighted assets shall be calculated in accordance with Part 325 of the FDIC Rules and Regulations ("Part 325"), 12 C.F.R. Part 325.

(b) If, while this ORDER is in effect, the Bank increases capital by the sale of new securities, the board of directors of the Bank shall adopt, implement, and adhere to a plan for the sale of such additional securities, including the voting of any shares owned or proxies held by or controlled by them in favor of said plan. Should the implementation of the plan involve public distribution of Bank securities, including a distribution limited only to the Bank's existing shareholders, the Bank shall prepare detailed offering materials fully describing the securities being offered, including an accurate description of the financial condition of the Bank and the circumstances giving rise to the offering, and other material disclosures necessary to comply with Federal and State securities laws. Prior to the implementation of the plan and, in any event, not less than 20 days prior to the dissemination of such materials, the materials used in the sale of the securities shall be submitted to the FDIC Registration and Disclosure Section, 550 17th Street, N.W., Washington, D.C.

8

20429, for review. Any changes requested to be made in the materials by the FDIC or the Division shall be made prior to their dissemination.

(c) In complying with the provisions of this paragraph, the Bank shall provide to any subscriber and/or purchaser of Bank securities written notice of any planned or existing development or other changes which are materially different from the information reflected in any offering materials used in connection with the sale of Bank securities. The written notice required by this paragraph shall be furnished within 10 calendar days of the date any material development or change was planned or occurred, whichever is earlier, and shall be furnished to every purchaser and/or subscriber of the Bank's original offering materials.

<u>GROWTH RESTRICTION</u>

5. While this ORDER is in effect, or until the Bank exceeds the capital requirements of this ORDER, the Bank will not have asset growth that exceeds three percent (3%) of the Bank's Average Total Assets as reported in the Report of Condition and Income of March 31, 2011.

<u>COLLATERAL APPRAISALS</u>

6. Within sixty (60) days of the effective date of this ORDER, the Bank shall obtain appraisals that comply with Part 323 of the FDIC's Rules and Regulations for the loans

9

designated as requiring appraisals or re-appraisals in the Report of Examination dated September 30, 2010 ("ROE").

### LOSS CHARGE-OFF

7.   As of the effective date of this Order the Bank shall charge off from its books and records any asset classified "Loss" in the ROE.

### RECOGNITION OF NONACCRUAL LOANS

8.   (a)  As of the effective date of this ORDER, the Bank shall conform to its loan policy and recognize all applicable loans as in nonaccrual status.

     (b)  Any loan that is, has been, or becomes contractually past due ninety (90) days or more for principal, interest or maturity payment shall be placed on nonaccrual status and the Bank shall not recognize any unpaid interest income from the day the loan became ninety (90) days past due. Any payments made since the loan first became past due shall be used to reduce the principal balance.

     (c)  The return of any loan to accrual status shall be consistent with the Federal Financial Institutions Examination Council's ("FFIEC") Reports of Income and Condition instructions and glossary.

### REDUCTION OF DELINQUENCIES AND CLASSIFIED ASSETS

9.   (a)  Within 45 days from the effective date of this ORDER, the Bank shall formulate and implement a written plan to

10

reduce the Bank's risk position in each asset in excess of $250,000 which is more than 90 days delinquent or classified "Substandard" in the ROE. The plan shall include, but not be limited to, provisions which:

> (i) Review the financial position of each such borrower, including source of repayment, repayment ability, and alternative repayment sources;
>
> (ii) Evaluate the available collateral for each such credit, including possible actions to improve the Bank's position;
>
> (iii) Prohibit an extension of credit for the payment of interest;
>
> (iv) Establish dollar levels to which the Bank shall reduce each delinquency or classified asset within 6 and 12 months from the effective date of this ORDER; and
>
> (v) Provide for the submission of monthly written progress reports to the Bank's board of directors for review and notation in minutes of the meetings of the board of directors.

(b)  As used in this paragraph, "reduce" means to: (1) collect; (2) charge off; (3) sell; or (4) improve the quality of such assets so as to warrant removal of any adverse classification by the FDIC and the Division.

(c)  While this Order remains in effect, the plan shall be revised to include assets which become delinquent or are adversely classified at any subsequent examinations.

(d)  The plan required by this paragraph shall be submitted to the Regional Director and the Division for review and comment.

<u>PROHIBITION OF ADDITIONAL LOANS TO CLASSIFIED BORROWERS</u>

10.  (a)  As of the effective date of this ORDER, the Bank shall not extend, directly or indirectly, any additional credit to, or for the benefit of, any borrower who is already obligated in any manner to the Bank on any extensions of credit (including any portion thereof) that has been charged off the books of the Bank or classified "Loss" in the ROE.

(b)  As of the effective date of this ORDER, the Bank shall not extend, directly or indirectly, any additional credit to, or for the benefit of, any borrower whose loan or other credit has been classified "Substandard", "Doubtful", or is listed for Special Mention in the ROE, and is uncollected unless the Bank's board of directors has provided the FDIC and the Division, a detailed written statement giving the reasons

12

why such extension of credit is in the best interest of the Bank. A copy of the statement shall be signed by each Director, and incorporated in the minutes of the applicable board of directors' meeting. A copy of the statement shall be placed in the appropriate loan file.

SPECIAL MENTION

11. Within 60 days from the effective date of this ORDER, the Bank shall implement procedures to reduce the incidence of loan underwriting deficiencies resulting in loans being listed for "Special Mention."

LOAN PARTICIPATIONS

12. Following the effective date of this ORDER, the Bank shall not repurchase any loan participations unless legally obligated to do so, if:

(a) the loan has been adversely classified by the FDIC and/or the Division and remains classified as of the date a repurchase is considered; or

(b) the loan exhibits any of the following characteristics:

(i) the loan is, or should be, in non-accrual status as defined in the instructions for the preparation of Reports of Condition and Reports of Income;

13

        (ii)   principal or interest payments are more than 30 days past due;

        (iii)  the terms of the loan have been renegotiated or compromised due to the deteriorating financial condition of the borrower.

<u>CREDIT DATA/COLLATERAL DOCUMENTATION EXCEPTIONS</u>

13.  Effective immediately, the Bank shall require complete loan documentation, realistic repayment terms and current financial information adequate to support the outstanding indebtedness of each borrower.  Such financial information shall include, at a minimum, detailed balance sheets, profit and loss statements, or copies of tax returns, and cash flow projections.

<u>LOAN COMMITTEE</u>

14.  (a)  As of the effective date of this ORDER, the Bank's loan committee shall meet as frequently as necessary to carry out the responsibilities assigned to the committee, but in no event less frequently than once a month.  The loan committee shall include at least three independent directors. For purposes of this ORDER, a person who is an independent director shall be any individual:

14

(i)    who is not an officer of the Bank, any
       subsidiary of the Bank, or any of its
       affiliated organizations;

(ii)   who does not own more than three percent
       of the outstanding shares of the Bank;

(iii)  who is not related by blood or marriage to
       an officer or director of the Bank or to
       any shareholder owning more than three
       percent of the Bank's outstanding shares,
       and who does not otherwise share a common
       financial interest with such officer,
       director or shareholder; and

(iv)   who is not indebted to the Bank directly
       or indirectly by blood, marriage or common
       financial interest, including the
       indebtedness of any entity in which the
       individual has a substantial financial
       interest in an amount exceeding three
       percent of the Bank's total Tier 1 capital
       and allowance for loan and lease losses;
       or

(v)    who is deemed to be an independent
       director for purposes of this ORDER by the
       Regional Director and the Division.

15

(b) The loan committee shall, at a minimum, perform the following functions:

> (i) Evaluate, grant and/or approve loans in accordance with the Bank's loan policy, as revised and amended in compliance with this ORDER. The loan committee shall provide a thorough written explanation of any deviations from the loan policy, and such explanation shall address how the deviations are in the Bank's best interest. The written explanation shall be included in the minutes of the corresponding committee meeting.

> (ii) Review and monitor the status of repayment and collection of overdue and maturing loans, as well as all loans classified "substandard" or "doubtful" in the ROE or that are included on the Bank's internal watch list.

> (iii) Review and give prior written approval for all advances, renewals, or extensions of credit to any borrower or the borrower's related interests when the aggregate volume of credit extended to the borrower

16

and the borrower's related interests exceeds $250,000. For purposes of this ORDER, the term "related interest" is defined pursuant to section 215.2(n) of Regulation O of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 215.2(n).

(iv) Review all applications for new loans and renewals of existing loans to Bank directors, executive officers, and their related interests, and prepare a written opinion as to whether the credit is in conformance with the Bank's loan policy and all applicable laws, rules, and regulations. Such applications, renewals, and written opinions shall be referred to the Bank's board of directors for consideration.

(v) Maintain written minutes of the committee meetings, including a record of the review and status of the aforementioned loans.

(c) All loan committee minutes shall be reviewed by the Bank's board of directors during the next scheduled meeting.

17

<u>LOAN REVIEW</u>

15.  Within 60 days of the effective date of this ORDER,
the board of directors shall revise its written loan review
procedures.  Loan review procedures shall be designed to
identify and categorize problem credits and to assess the
overall quality of the Bank's loan portfolio.

<u>CONCENTRATIONS OF CREDIT</u>

16.  (a)  Within 30 days from the effective date of this
ORDER the Bank will formulate an implement a written plan to
reduce the loan concentrations of credit identified in the ROE.
Such plan shall include, but not be limited to:

> (i)     Dollar levels to which the Bank shall
> reduce each concentration; and

> (ii)    Provision for the submission of monthly
> written progress reports to the Bank's
> board of directors for review and
> notation in the minutes of the board of
> directors' meetings.

(b)  The plan required by this paragraph shall be
submitted to the Regional Director and the Division for review
and comment.

<u>PROFIT PLAN AND BUDGET</u>

17.  (a)  Within 60 days from the effective date of this
ORDER, the Bank shall develop and implement a written profit

18

plan and a realistic, comprehensive budget for all categories of income and expense for calendar years 2012 and 2013. The plans required by this paragraph shall contain formal goals and strategies, consistent with sound banking practices, to reduce discretionary expenses and to improve the Bank's overall earnings, and shall contain a description of the operating assumptions that form the basis for major projected income and expense components.

(b)  The written profit plan shall address, at a minimum:

(i)  Realistic and comprehensive budgets, including growth and margin assumptions;

(ii)  Maintenance of an adequate Allowance for Loan and Lease Losses ("ALLL);

(iii)  A budget review process to monitor the income and expenses of the Bank to compare actual figures with budgetary projections;

(iv)  Identification of major areas in, and means by which, earnings will be improved;

(v)  A description of the operating assumptions that form the basis for

19

and adequately support major projected income and expense components; and

(vi)  Clear assignment of responsibility for implementing the written profit plan.

(c)  Within 30 days from the end of each calendar quarter following completion of the profit plans and budgets required by this paragraph, the Bank's board of directors shall evaluate the Bank's actual performance in relation to the plan and budget, record the results of the evaluation, and note any actions taken by the Bank in the minutes of the board of directors' meeting at which such evaluation is undertaken.

(d)  A written profit plan and budget shall be prepared for each calendar year for which this ORDER is in effect.

(e)  The plans and budgets required by this paragraph shall be submitted to the Regional Director and the Division for review and comment.

### ALLOWANCE FOR LOAN AND LEASE LOSSES

18.  (a) Within 30 days from the effective date of this ORDER the Bank shall have and thereafter maintain an adequate ALLL.

20

(b) Prior to submission or publication of all Reports of Condition and Income required by the FDIC and the Division after the effective date of this ORDER, the board of directors of the Bank shall review the adequacy of the Bank's ALLL, provide for an adequate ALLL, and accurately report the same. The minutes of the board meeting at which such review is undertaken shall indicate the findings of the review, the amount of increase in the ALLL recommended, if any, and the basis for determination of the amount of ALLL provided. In making these determinations, the board of directors shall consider the FFIEC Instructions for the Reports of Condition and Income and any analysis of the Bank's ALLL provided by the FDIC or the Division.

(c) ALLL entries required by this paragraph shall be made prior to any Tier 1 capital determinations required by this ORDER.

### AMENDED REPORTS OF CONDITION AND INCOME

19. Within thirty (30) days of the effective date of this ORDER, the Bank shall amend its Reports of Condition and Income staring with September 30, 2010, and for each subsequent quarter to reflect:

(a) the loan loss provision recommended in the ROE;

(b) the nonaccrual loan adjustments; and

(c) the charge off of Loss required by the ROE.

21

## DIVIDEND RESTRICTION

20. As of the effective date of this ORDER, the Bank shall not declare or pay any dividend without the prior written consent of the Regional Director and the Division.

## CORRECTION OF VIOLATIONS

21. Within 60 days from the effective date of this ORDER, the Bank shall eliminate and/or correct all violations of law, rule, and regulations listed in the ROE.

## NOTIFICATION TO SHAREHOLDER

22. Following the effective date of this ORDER, the Bank shall send to its shareholder a copy of this ORDER: (1) in conjunction with the Bank's next shareholder communication; or (2) in conjunction with its notice or proxy statement preceding the Bank's next shareholder meeting.

## PROGRESS REPORTS

23. Within 30 days from the end of each calendar quarter following the effective date of this ORDER, the Bank shall furnish to the Regional Director and the Division written progress reports signed by each member of the Bank's board of directors, detailing the actions taken to secure compliance with the ORDER and the results thereof. Such reports may be discontinued when the corrections required by this ORDER have been accomplished and the Regional Director and the Division

have, in writing, released the Bank from making further reports.

The effective date of this ORDER shall be 10 days after the date of its issuance by the FDIC and the Division.

The provisions of this ORDER shall be binding upon the Bank, its institution-affiliated parties, and any successors and assigns thereof.

The provisions of this ORDER shall remain effective and enforceable except to the extent that, and until such time as, any provision has been modified, terminated, suspended, or set aside by the FDIC and the Division.

Pursuant to delegated authority.


Dated:    May __31_____, 2012.



/S/_____     /S/_____
M. Anthony Lowe                 Manuel Flores
Regional Director               Director
Chicago Regional Office         Division of Banking
Federal Deposit Insurance       Illinois Department of
    Corporation                     Financial and Professional
                                    Regulation


23

# EXHIBIT 2



**Federal Deposit Insurance Corporation**
Division of Risk Management Supervision
300 South Riverside Plaza, Suite 1700, Chicago, IL  60606

Chicago Regional Office
Phone (312) 382-7500
Fax (312) 382-6901

April 2, 2015

Board of Directors
Edgebrook Bank
6000 W. Touhy Avenue
Chicago, Illinois 60646

Members of the Board:

On March 28, and March 30, 2015, President Ptak sent email correspondence to Assistant
Regional Director David Van Vickle and Case Manager John Mielecki asking that the FDIC
review and approve loan extensions for 11 lending relationships at the Bank.  On April 2, 2015,
bank counsel Robert Michels sent an email request to FDIC counsel John Guarisco requesting
90-day extensions on 32 additional loans.  The requests are pursuant to requirements established
in the Temporary Cease and Desist Order (Temporary Order) that the FDIC issued on March 18,
2015.



Edgebrook Bank
Chicago, Illinois

Page 2

████████████████████████████████████████████

████████████████████████████

Our office is prepared to act as quickly as possible to respond to the bank's requests for loan extensions and renewals, as required by the Temporary Order; however, it is incumbent upon you to provide sufficient information for us evaluate. Please ensure that future requests clearly support the reasons why the FDIC should approve the bank's decision to make loans or extensions of credit of any type. Each request should clearly indicate that the Board of Directors has approved the recommendation by signing loan presentation forms prior to submitting the request to the FDIC.

Additionally, we note that Mr. Ptak is acting as the bank's point of contact for many of these renewal requests. You are reminded that all lending authority was removed from Mr. Ptak in a Consent Order stipulated by the Board and effective June 10, 2012.

If you have any questions or comments please contact Case Manager John M. Mielecki at (312) 382-6920, or write to me at the above address.

Sincerely,

M. Anthony Lowe
Regional Director

cc: State of Illinois
    Federal Reserve Bank of Chicago

# EXHIBIT 3



**Federal Deposit Insurance Corporation**
**Division of Risk Management Supervision**
**Chicago Regional Office**
300 South Riverside Plaza, Suite 1700
Chicago, Illinois 60606
Telephone: (312) 382-7500



**Illinois Department of Financial**
**and Professional Regulation**
**Division of Banking**
100 West Randolp, 9th Floor
Chicago, Illinois 60601
Telephone: (312) 793-7090

February 10, 2015

**Sent electronically and via overnight mail:**

Board of Directors
Edgebrook Bank
6000 W. Touhy Avenue
Chicago, Illinois    60646

Members of the Board:

The FDIC and Illinois Department of Financial and Professional Regulation (IDFPR) conducted a limited scope visitation (Visit) of Edgebrook Bank beginning November 3, 2014, using financial information as of September 30, 2014.

Edgebrook Bank
Chicago, Illinois

Page 2



If you have any questions, contact FDIC Case Manager John M. Mielecki at (312) 382-6920, or IDFPR Acting District Supervisor Renee Skibinski at (312) 793-4363.

Sincerely,

M. Anthony Lowe
Regional Director
Federal Deposit Insurance Corporation

Marc A. Edwards
Manager, Bank and Thrift Supervision
Illinois Department of Financial and
Professional Regulation,
Division of Banking

Enclosures

cc: Federal Reserve Bank of Chicago

# EXHIBIT 4



**Federal Deposit Insurance Corporation**
**Division of Risk Management Supervision**
**Chicago Regional Office**
300 South Riverside Plaza, Suite 1700
Chicago, Illinois 60606
Telephone: (312) 382-7500



**Illinois Department of Financial**
**and Professional Regulation**
**Division of Banking**
100 West Randolp, 9th Floor
Chicago, Illinois 60601
Telephone: (312) 793-7090

March 24, 2015

**Sent electronically and via overnight mail:**

Board of Directors
Edgebrook Bank
6000 W. Touhy Avenue
Chicago, Illinois    60646

Members of the Board:

The FDIC and Illinois Department of Financial and Professional Regulation (IDFPR) conducted a limited scope visitation (Visit) of Edgebrook Bank beginning February 3, 2015, using financial information as of December 31, 2014. Each Director should thoroughly review the Visitation Report, acknowledge this review by signing the included forms, and record the Board's review in the minutes. Please execute the enclosed State Official Acknowledgment Form and send a copy to IDFPR by May 10, 2015.



If you have any questions on the findings of this Visit or other matters addressed in this letter, contact FDIC Assistant Regional Director David A. VanVickle at (312) 382-7551, or IDFPR Acting District Supervisor Renee Skibinski at (312) 793-4363.

Sincerely,

M. Anthony Lowe
Regional Director
Federal Deposit Insurance Corporation

Marc A. Edwards
Manager, Bank and Thrift Supervision
Illinois Department of Financial and
Professional Regulation,
Division of Banking

Enclosures

cc: Federal Reserve Bank of Chicago

# EXHIBIT B

### DECLARATION OF JAMES A. BOUDREAU

I, James A. Boudreau, do hereby aver that:

1.     I have been employed by the Federal Deposit Insurance Corporation (FDIC) for 24 years. From May of 1991 to May 1994, I was an assistant Bank Examiner. I received my Commission as a Bank Examiner in 1994. I have been assigned to the Chicago Territory Field Office, Chicago Regional Office, and Division of Risk Management Supervision since 1991. I earned the Chicago Region Employee of the Year Award in 2004. I report to Regional Director M. Anthony Lowe through my field office supervisor. I also coordinate and share information with the Illinois Department of Financial and Professional Regulation, Division of Banking, regarding joint examinations of banks. I have personal knowledge of the facts set forth in this Declaration.

2.     I received an Associate of Arts degree from Kankakee Community College, Kankakee, Illinois in 1989, and Bachelor of Arts Degree from Northern Illinois University, DeKalb, Illinois in 1991. I completed a program at the Graduate School of Banking at the University of Wisconsin, Madison, Wisconsin in 2004.

3.     I have a thorough knowledge and understanding of the FDIC's rules and regulations, financial institution letters, policies and guidance applicable to banks, including the Interagency Guidelines Establishing Standards for Safety and Soundness, 12 C.F.R. Pt. 364, App. A (Safety and Soundness Guidelines).

4.     Approximately 90% of my work is conducting bank examinations. I have participated in over 500 bank examinations, including 51 Examiner-In-Charge (EIC) assignments and numerous as EIC on back-up authority visits to problem banks.

5.     Comprehensive bank examinations enhance the FDIC's ability to maintain public confidence in financial institutions and the banking system. Given the

fundamental reasons for conducting examinations, regulatory personnel must have access to all records and employees of a bank during an examination.

6.　　As an Examiner at the FDIC, I have direct responsibility for conducting risk management examinations of banks to which I am assigned. The Chicago Regional Office supervises insured state non-member financial institutions located in Michigan, Wisconsin, Illinois, Ohio, Indiana, and Kentucky, including Edgebrook Bank, a state-chartered bank with its principal place of business in Chicago, Illinois (Bank).

7.　　Since June 10, 2012, the Bank has operated under the May 31, 2012 Consent Order issued pursuant to 12 U.S.C § 1818(b). Notwithstanding the Consent Order, unsafe or unsound practices and violations of law, rules or regulations have occurred and continue to occur, requiring immediate remedial action.

8.　　I participated in the April 2014 full scope joint risk management examination (2014 Examination) of the Bank and was the EIC of the November 2014 Visitation and the February 2015 Visitation. A full scope exam is required at all problem banks at least annually and employs a larger exam team to assess each of the CAMELS areas. A narrower visit is performed at problem banks at six months between full scope exams and assesses the bank's condition and management in relation to the prior exam findings. I conducted various meetings with Bank management, and I performed numerous other supervisory and examination duties related to the Bank during the 2014 Examination, November 2014 and February 2015 Visitations.

9.　　Tier 1 capital is the core measure of a bank's financial strength from a regulator's point of view. It is composed of core capital which consists primarily of common stock and disclosed reserves (or retained earnings), but may also include non-redeemable non-cumulative preferred stock. The Bank's Tier 1 Capital ratio as of the

2

February 2015 Visitation is ███████████, ███████████████████████
███████████████. The Consent Order requires a minimum Tier 1 Capital ratio
of 9%.

10.     In my opinion, as a result of my observations at the 2014 Examination and
November 2014 and February 2015 Visitations, the Bank's lending function has become
severely impaired through a combination of hazardous lending practices, deficiencies in
credit risk assessment, and underwriting. The Bank is lending to borrowers who have not
demonstrated the capability to repay loans, resulting in a large number of non-performing
assets and adversely classified assets.

11.     Examples of the Bank's hazardous lending practices include:

(a)     The Bank disburses draws on construction loans directly to
borrowers without obtaining supporting invoices for the draws, waivers of any third party
liens, or using third party inspectors.

(b)     The Bank disburses funds directly to borrowers to pay delinquent
property taxes on collateral with no safeguards to insure the taxes are paid and closes
loans without clearing title exceptions.

(c)     The Bank pays off third party liens in excess of the amount set
forth in the title commitment without obtaining appropriate documentation for the
increased amount.

(d)     The Bank has no established procedure for ordering or tracking
orders for appraisals.

(e)     The Bank makes new loans to problem borrowers who have
existing problem loans with the Bank.

3

12.     The Bank has masked its true financial condition by making new loans with terms unfavorable to the Bank in order to refinance troubled borrowers and has failed to put loans into non-accrual status when full collection of principal and interest is in doubt, thereby overstating its income.

13.     The Bank has delayed recognizing problem assets, has deferred recognizing losses by funding new high risk loans with concessionary terms to pay off problem assets, such as no equity investment, 100% financing with interest only repayment terms and no personal guarantee , and has failed to appropriately account for new loans used to pay off problem assets.

14.     At the February 2015 Visitation, I confirmed that the Bank recently issued a new, unsecured interest-only loan to a borrower who already had past due loans at the Bank. The loan presentation is dated February 12, 2015, and the entire Board of Directors approved the loan on the same date.  Loan proceeds of $129,750 were wired to the borrower's deposit account at JP Morgan Chase, N.A. on February 12, 2015.  The borrower is part of a 9-loan relationship involving seven borrowers.  The entire loan relationship is adversely classified and five of the nine loans within this loan relationship are more than 100 days past due and all nine are past due, including outstanding loans to the borrower and a corporate entity of which the borrower is an owner and officer.

15.     



16.



20.    The identical concerns were still evident at the February Visitation which

concluded on March 12, 2015.



21.

22.    In addition to hazardous lending and related deficiencies, the Bank's

failure to recognize problem assets, deferral of loss, failure to place loans in non-accrual

status, and failure to adequately fund its Allowance for Loan and Lease Losses (ALLL)

has resulted in the Bank filing inaccurate and misleading Consolidated Reports of

Condition and Income (Call Reports).

23.    All banks must maintain an ALLL adequate to absorb estimated credit

losses associated with their loan and lease portfolio, that is, loans and leases that the bank

has the intent and ability to hold for the foreseeable future or until maturity or payoff.

Management must evaluate the adequacy of the ALLL on a quarterly basis, and

appropriate provisions should be made.  When an ALLL is deemed inadequate,

management is required to increase the provision for loan and lease loss expense to

restore the ALLL to an adequate level.

7

24.    A Bank's other real estate owned (OREO) consists of real property held
for reasons other than to conduct bank business.  Banks usually acquire OREO through
foreclosure after a borrower defaults on a loan secured by real estate.  Bank management
should establish appropriate policies and procedures that protect a bank's interests in
OREO while mitigating the impact on surrounding property values and ensure that
OREO is accounted for in conformance with generally accepted accounting principles
(GAAP) and Call Report Instructions.

25.



26.

27.    Within thirty days of the end of a quarter, a Bank is required to file a
Report of Condition and Income (Call Report).  At the time of the November Visit, the
Bank's most recent Call Report was filed on October 30, 2014.  At the time of the
February Visit, the Bank's most recent Call Report was filed on January 30, 2015.

28.    The Call Reports must be completed in an accurate and consistent manner
to reflect a fair presentation of the Bank's financial condition and results of operations.
The FDIC uses Call Report data to monitor the condition, performance, and risk profile
of individual banks and the banking industry as well as to calculate deposit insurance
assessments.  The public relies on Call Reports as a source of information about a bank's

earnings, balance sheet, asset quality, liquidity, and capital levels. A Call Report is one of the best tools for the public to ascertain the financial condition of banks.



29. 

31. By letter dated February 10, 2015, the Bank was notified pursuant to 12 C.F.R. § 325.102 that it was Critically Undercapitalized and that it was now subject to the restrictions on Critically Undercapitalized institutions found in 12 C.F.R. § 325.105(a) and 12 U.S.C. § 1831o. The February 10, 2015 letter enumerated the specific restrictions on Critically Undercapitalized institutions applicable to the Bank, including the restriction on entering into any material transactions without the prior written approval of the FDIC. Part 325.105(a) outlines various material transactions including the sale of assets. The FDIC's February 10, 2015 letter specifically stated the sale of assets was a material transaction. A copy of which is attached hereto as Exhibit 1.

32. On February 24, 2015, the Bank sold assets totaling approximately $1,600,000 in violation of 12 U.S.C § 1831o and Part 325 of the FDIC's Rules and Regulations. The Bank did not seek or obtain FDIC's approval before selling $1,600,000 in assets.

33.



I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 10, 2015.

James A. Boudreau
Examiner

# EXHIBIT 1



**Federal Deposit Insurance Corporation**
Division of Risk Management Supervision
300 South Riverside Plaza, Suite 1700, Chicago, IL 60606

Chicago Regional Office
Phone (312) 382-7500
Fax (312) 382-6901

February 10, 2015

**Sent electronically and via overnight mail:**

Board of Directors
Edgebrook Bank
6000 West Touhy Avenue
Chicago, IL 60646

Members of the Board:

This letter is to notify you of Edgebrook Bank's capital category for purposes of the prompt corrective action provisions of section 38 of the Federal Deposit Insurance Act, 12 U.S.C. § 1831o and the FDIC's implementing regulations at 12 C.F.R. § 325 subpart B.

Based on an analysis of November 4, 2014 Visitation and the September 30, 2014 Report of Condition and Income, we calculate your key capital ratios as follows:

| | |
|---|---|
| Total Risk-Based Capital Ratio | █ % |
| Tier 1 Risk-Based Capital Ratio | █ % |
| Tier 1 Leverage Ratio | █ % |
| Tangible Equity Capital Ratio | █% |

Based on the above, it has been determined that your bank falls within the *Critically Undercapitalized* capital category.

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

Edgebrook Bank
Chicago, Illinois                                                                    Page 2

Edgebrook Bank
Chicago, Illinois                                                           Page 3



This written notice remains in effect until such time as it is modified or rescinded by the FDIC.

Questions regarding this letter or related matters may be directed to Assistant Regional Director David A. VanVickle or Case Manager John M. Mielecki at (312) 382-7500.

Sincerely,

M. Anthony Lowe
Regional Director

cc: State of Illinois
     Federal Reserve Bank of Chicago

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of April 2015, I will serve the foregoing by electronic mail on all counsel of record.

<u>/s/*John W. Guarisco*_____</u>
John W. Guarisco