**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EDGEBROOK BANK,** | ) | |
|     Plaintiff, | ) | Case No. 15 C 2759 |
| | ) | |
|     v. | ) | Judge Joan B. Gottschall |
| | ) | |
| **FEDERAL DEPOSIT INSURANCE** | ) | |
| **CORPORATION,** | ) | |
|     Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Dissatisfied with a temporary cease-and-desist order issued by the FDIC pursuant to 12 U.S.C. § 1818(c)(1), plaintiff Edgebrook Bank filed a motion for a temporary restraining order and preliminary injunction asking the court to set aside the FDIC's temporary cease-and-desist order or, alternatively, to modify and limit certain provisions in that order. As detailed below, the court believes that oral argument would help it resolve the Bank's challenge to the portion of the temporary cease-and-desist order regarding the Bank's call reports. Thus, the Bank's motion remains under advisement.

**I. B**ACKGROUND[1]

Edgebrook is an Illinois state-chartered, FDIC-insured community bank based in

---

[1] The following facts are drawn from the Bank's complaint. Additional confidential additional facts are set forth in the parties' sealed submissions. The court has considered all of the parties' filings but will confine its discussion of the facts in this opinion to matters of public record. *See Pepsico, Inc. v. Redmond*, 46 F.3d 29, 30 (7th Cir. 1995) (litigation generally belongs in the public domain, so although genuinely confidential information may be filed under seal, the court's decisions should be in public view; even "the judge who enjoined publication of details of the hydrogen bomb's construction managed to explain his decision to the public."). In determining what is a matter of public record, the court has relied on the parties' redactions (which are not disputed) and the courtesy copies of the briefs, which delineate what portions are confidential.

Chicago, Illinois. The FDIC is a federal agency of the United States and is the Bank's primary federal regulator.

**A.     The Notice of Charges**

The Federal Deposit Insurance Act ("FDIA") authorizes the FDIC to institute an administrative cease-and-desist proceeding against a bank by serving the bank with a "notice of charges" alleging the bank has engaged in unsafe or unsound practices or violated a law, rule, regulation, or condition imposed by the FDIC. 12 U.S.C. § 1818(b)(1). The notice of charges must contain a statement of facts and set a time and place for a hearing that must occur within 60 days. *Id*. If the administrative law judge finds that "any violation or unsafe or unsound practice specified in the notice of charges has been established," it may issue a cease-and-desist order. *Id*.

On March 19, 2015, the FDIC served Edgebrook with a notice of charges that commenced a formal administrative proceeding pursuant to 12 U.S.C. § 1818(b)(1). A copy of the notice of charges is attached to the complaint as Exhibit B. In sum, the notice of charges asserts that the quality of the Bank's loans (also known as "asset quality") is critically deficient, and that the Bank has engaged in a wide variety of "hazardous lending" practices, is operating with unacceptable concentrations in construction and restaurant loans with insufficient risk management controls for such loans, and lacks an adequate allowance for loan and lease loss reserves ("ALLL" reserves).[2] The notice of charges also asserts that the Bank has obfuscated its

---

[2] With respect to ALLL reserves, bank examiner Boudreau explains that:

All banks must maintain an ALLL adequate to absorb estimated credit losses associated with its loan and lease portfolio, that is, loans and leases that the bank has the intent and ability to hold for the foreseeable future or until maturity or

true financial condition by making new loans with terms that are unfavorable to the Bank for the purpose of refinancing troubled borrowers, and that the bank is "critically undercapitalized" as that term is used in the FDIA. *See* 12 U.S.C. § 1831o; 12 C.F.R. § 325.103. (Compl. Ex. B, Dkt. 1-1.)

The Bank contends that the allegations in the notice of charges are based on an examination of its books and records as of September 30, 2014, and "even earlier." (Compl. ¶ 19, Dkt. 1.) It alleges that the FDIC has not asserted that the Bank has recently engaged in allegedly hazardous lending practices and has ignored "numerous actions that [it] has taken in recent months that have improved its condition and lending practices." (*Id*. ¶ 21.)

**B.     The FDIC's Temporary Cease-and-Desist Order**

In addition to initiating administrative proceedings, the FDIA also authorizes the FDIC to seek a temporary cease-and-desist order. *See* 12 U.S.C. § 1818(c)(1). Specifically, if the FDIC has commenced administrative proceedings against a bank by serving a notice of charges, it can issue a temporary cease-and-desist order that is effective when it is served on a bank if the FDIC believes that "the violation or threatened violation or the unsafe or unsound practice or practices, specified in the notice of charges . . . is likely to cause insolvency or significant dissipation of assets or earnings of the depository institution, or is likely to weaken the condition of the

---

      payoff.  Management must evaluate the adequacy of the ALLL on a quarterly
      basis, and appropriate provisions should be made.  When an ALLL is deemed
      inadequate, management is required to increase the provision for loan and lease
      loss expense to restore the ALLL to an adequate level.

(Boudreau Decl. at ¶ 23, Dkt. 28, Ex. B.)

depository institution or otherwise prejudice the interests of its depositors prior to the completion of the [administrative] proceedings." *Id*.

A temporary cease-and-desist order "may include any requirement authorized under subsection (b)(6) of this section." *Id*. Thus, the affected bank may be required to:

- (A) make restitution or provide reimbursement, indemnification, or guarantee against loss if –

  - (i) such depository institution or such party was unjustly enriched in connection with such violation or practice; or

  - (ii) the violation or practice involved a reckless disregard for the law or any applicable regulations or prior order of the appropriate Federal banking agency;

- (B) restrict the growth of the institution;

- (C) dispose of any loan or asset involved;

- (D) rescind agreements or contracts; and

- (E) employ qualified officers or employees (who may be subject to approval by the appropriate Federal banking agency at the direction of such agency); and

- (F) take such other action as the banking agency determines to be appropriate.

12 U.S.C. § 1818(b)(6).

On March 19, 2015 (the same day it served its notice of charges on the Bank), the FDIC served the Bank with a temporary cease-and-desist order. A copy of the order is attached to the complaint as Exhibit A. A bank served with a temporary cease-and-desist order may challenge that order by filing suit in the United States district court for the judicial district in which the home office of the depository institution is located or the United States District Court for the District of Columbia. 12 U.S.C. § 1818(c)(2). The court may grant injunctive relief "setting

aside, limiting, or suspending the enforcement, operation, or effectiveness of [the temporary cease-and-desist] order pending the completion of the administrative proceedings pursuant to the notice of charges." *Id*. The present action is based on the FDIC's temporary cease-and-desist order.

The temporary cease-and-desist order incorporates the notice of charges by reference. It asserts that:

> [T]he unsafe or unsound banking practices which [the Bank] is alleged to have engaged in or which the FDIC has reason to believe the Bank is about to engage in, as specified in the NOTICE OF CHARGES . . . are likely to cause the significant dissipation of assets, weaken the condition of the Bank, or otherwise prejudice the interests of the depositors of the Bank prior to the completion of the proceedings against the Bank conducted pursuant [sic] 12 U.S.C. § 1818(b).

(Compl. Ex. A, Dkt. 1-1.) It then provides, in part, that:

1. "[T]he Bank shall not make any loans, or extensions of credit of any type without the prior written approval of the FDIC" with two exceptions that are not at issue;

2. "[T]he Bank shall amend its September 30, 2014 and December 31, 2014 Reports of Condition and Income [also known as "Call Reports"] to recognize the amount of the loan loss provision, the amount of the nonaccrual loan adjustments, interest income adjustments and provisions to the ALLL identified in the November 3, 2014 Report of Visitation, which shall include (a) $1,956,000 in provisions to the ALLL; [and] (b) $102,000 reversal of interest income inappropriately recognized for loans that were inappropriately accruing interest . . . ."

3. "On Monday of each week this TEMPORARY ORDER is in effect, the Bank shall provide to the Regional Director of the FDIC's Chicago Regional Office ("Regional Director") a list of all loan customers and lienholders who have received [certain specified] advances . . . and a list of [certain] overdrafts . . . ."; and

4. "The Bank and any institution affiliated party of the Bank shall not engage in any material transaction, including but not limited to a sale of assets, without the prior written approval of the FDIC."

(*Id*. ¶¶ 1-4.)

C.      **The Bank's Position Regarding ALLL Reserves**

The Bank disagrees with the FDIC regarding the appropriate amount of ALLL reserves. On March 6, 2015, it filed an administrative Request for Review and Reconsideration of Material Supervisory Determinations with the Illinois Department of Financial and Professional Regulation ("IDFPR"). (*Id*. ¶ 32.) The Bank "believes that the FDIC's position on the amount of ALLL reserves required runs directly contrary to ALLL standards issued by the Federal Accounting Standards Board, is inconsistent with guidance issued by federal regulators, and flatly ignores relevant facts and information that properly should be used in calculating the ALLL reserves." (*Id*. ¶¶ 32-33.)

The Bank further alleges that the ALLL reserve issue will be litigated as part of the cease-and-desist proceedings brought by the FDIC. According to the Bank, the calculation of ALLL reserves "is a critical issue to [it] as the FDIC and the IDFPR have used the ALLL calculations to contend that, as of September 30, 2014, the Bank was Critically Undercapitalized and thus subject to be put into automatic receivership by federal statute, in early May 2015." (*Id*. at ¶ 34.)

In its single-count federal complaint, the Bank seeks injunctive relief pursuant to 12 U.S.C. § 1818(c)(1). It asks the court to set aside the FDIC's temporary cease-and-desist order or to modify and limit the provisions in that order.

## II. STANDARD OF REVIEW

The Bank seeks both a temporary restraining order and a preliminary injunction. The Bank provided the FDIC with notice and the relief it requests is not limited to fourteen days.

Thus, the Bank appears to be moving for a preliminary injunction. *See* Fed. R. Civ. P. 65(a) & (b); *see also H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 843-46 (7th Cir. 2012).

Regardless, the standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. *Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, — F. Supp. 2d —, No. 15 C 551, 2015 WL 1497821, at *12 (N.D. Ill. Apr. 2, 2015). To obtain a preliminary injunction, the Bank must show that it has: "(1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits." *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011); *Triumph Packaging Grp. v. Ward*, 834 F. Supp. 2d 796, 805 n.7 (N.D. Ill. 2011) (to obtain a preliminary injunction, a plaintiff "must show that it is "reasonably likely to succeed on the merits") (collecting cases).

If it does so, the court must consider whether the injunction is in the public interest. *Stuller, Inc. v. Steak N Shake Enter., Inc.*, 695 F.3d 676, 679 (7th Cir. 2012). The court "weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Ezell*, 651 F.3d at 694. "These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010); *Ill. League of Advocates for Developmentally Disabled v. Ill. Dep't of Human Services*, — F. Supp. 2d —, No. 13 C 1300, 2014 WL 3605633, at *15 (N.D. Ill. July 21, 2014).

**III. DISCUSSION**

With respect to likelihood of success on the merits, the Bank raises three sets of arguments in support of its contention that it will be able to demonstrate that the temporary cease-and-desist order is improper and should be vacated or amended. First, the Bank contends that the FDIC's asserted basis for issuing the temporary cease-and-desist order is inadequate. Second, the Bank asserts that the FDIC is improperly attempting to subvert the Bank's IDFPR challenge to the calculation of its ALLL reserves, prevent the Bank from litigating this issue with the FDIC, and force the Bank into receivership. Third, the Bank argues that to the extent that the temporary cease-and-desist order is appropriate, the provision requiring the Bank to obtain FDIC approval for any loans will hinder the Bank's ability to conduct business and earn income because it gives the FDIC the unfettered discretion to decide whether to approve loans and thus allows the FDIC to act unreasonably or in an untimely manner.

The court will address likelihood of success and irreparable harm in this opinion based on the parties' written submissions. The court believes that oral argument would help it resolve the Bank's challenge to the portion of the temporary cease-and-desist order regarding the Bank's past and future call reports. After argument is held, the court will balance the harms, analyze the public interest, and rule on the Bank's motion.

**A.     The FDIC's Rationale for Issuing the Temporary Cease-and-Desist Order –
          Likelihood of Success on the Merits**

The Bank challenges the issuance of the temporary cease-and-desist order, arguing that the FDIC's allegations lack evidentiary support and do not show that there is a likelihood of "insolvency or significant dissipation of assets or earnings" or that the Bank's conduct or condition "is likely to weaken" the Bank "or otherwise prejudice the interests of its depositors

prior to the completion of the [administrative] proceedings," as required by 12 U.S.C. §1818(c)(1). Relatedly, the Bank argues that the temporary cease-and-desist order is based on outdated information that does not account for the Bank's new and materially different circumstances.

The "object of judicial review [of a temporary cease-and-desist order] is to ensure that a factual and statutory basis exists for the agency's action and that the temporary order comports with the scope of the [agency's] powers." *Hamilton Bank, N.A. v. Office of Comptroller of Currency*, 227 F. Supp. 2d 1, 8 (D. D.C. 2001) (quoting *Parker v. Ryan*, 959 F.2d 579, 583 (5th Cir. 1992)). The Bank vigorously argues that the notice of charges and the allegations in the temporary cease-and-desist order do not support the issuance of temporary relief pursuant to § 1818(c)(1). The court disagrees.

The FDIC submitted verified declarations from David Van Vickle (the Assistant Regional Director of the Central Region of the FDIC) and James Boudrau (a bank examiner with the FDIC). The declarations detail the FDIC's examinations of the Bank and its lending practices and provide specific examples of loans based on information from 2014 as well as from an additional visitation that started in February 2015 and ended on March 12, 2015. The FDIC adversely classified these loans, for reasons detailed in sealed portions of the declarations. This information is neither stale nor from the "distant past." (Pl. Memo. at 14, Dkt. 29.)

Without getting into the details of the loans discussed in the declaration due to concerns about confidentiality, the evidence submitted by the FDIC supports its claim that during the course of the administrative proceedings, the Bank has (among other things) been engaging in ongoing unsound practices that are likely to cause significant dissipation of assets and weaken its

condition. *See Lenz v. Federal Deposit Ins. Corp.*, 251 F. Supp. 2d 121, 124 (D. D.C. 2003) (declaration from FDIC credit account officer describing issues with eleven loans was sufficient to support the FDIC's allegations of injury caused by actions taken by the board chairman of a failed bank).

The verified declarations generally track the factual allegations in the notice of charges as well as the temporary cease-and-desist order and thus support the issuance of the temporary cease-and-desist order. Perhaps a more fully developed record will belie the FDIC's allegations. The court's present task, however, is to determine if the temporary cease-and-desist order was properly supported when it issued, as challenges to the FDIC's evidence "must be reserved for the merits of the underlying proceeding." *Hamilton Bank*, 227 F. Supp. 2d at 8.

It is true that the FDIC did not include all of the allegations in the declarations in the temporary cease-and-desist order. But the Bank has not explained how the FDIC could have done so given the confidential nature of the information. Moreover, while the Bank may disagree with the FDIC's position, it does not contend that it did not understand the basis for the temporary cease-and-desist order. Any such claim would be unconvincing given the parties' discussions prior to the issuance of the temporary cease-and-desist order. Finally, the court declines to fault the FDIC for submitting evidence in opposition to the Bank's motion seeking injunctive relief. It was entitled to do so, and the FDIC's opposition to the Bank's motion does not amount to a tacit concession that the FDIC's temporary cease-and-desist order was unsupported when it was issued.

B.  **The Reporting Conditions in the Temporary Cease-and-Desist Order – Likelihood of Success on the Merits and Irreparable Harm**

12 C.F.R. § 304.3 provides that:

> Pursuant to section 7(a) of the Federal Deposit Insurance Act (12 U.S.C. 1817(a)), every national bank, state member bank, and insured state nonmember bank is required to file Consolidated Reports of Condition and Income (also known as the Call Report) in accordance with the instructions for these reports. All assets and liabilities, including contingent assets and liabilities, must be reported in, or otherwise taken into account in the preparation of, the Call Report. The FDIC uses Call Report data to calculate deposit insurance assessments and monitor the condition, performance, and risk profile of individual banks and the banking industry.

Call reports provide a standardized method of reporting information that "enables the FDIC to perform its Bank supervisory and surveillance function in a consistent manner, and ensure reasonable, accurate data to other federal and state regulatory authorities as well as to the general public." *In the Matter of * * * Bank (Insured State Nonmember Bank)*, No. FDIC-85-18b, 1986 WL 379682, at *15 (F.D.I.C. June 16, 1986). Call reports are prepared according to generally accepted accounting principles. *Id*.

In this case, the Bank raises several related arguments based on the temporary cease-and-desist order's requirement that it amend the portions of its September and December call reports dealing with ALLL reserves and calculate and disclose the ALLL reserves differently moving forward. The Bank argues that the FDIC has not shown that the reporting conditions in the temporary cease-and-desist order will prevent or remedy any insolvency or dissipation of assets so they are not necessary to accomplish § 1818(c)(1)'s purpose. The Bank also argues that the reporting conditions represent an improper attempt by the FDIC to subvert the Bank's IDFPR challenge to the calculation of its ALLL reserves, prevent the Bank from litigating this issue with the FDIC, and force the Bank into receivership.

In response, the FDIC repeats its contention that the Bank has not accurately reported its financial condition due to its "failure to recognize problem assets, its deferral of loss, its failure to place loans in non-accrual status, and its failure to adequately fund its [ALLL reserves]." (FDIC Resp. at 8, Dkt. 28; Boudreau Decl. at ¶ 22, Dkt. 28, Ex. B). According to the FDIC, these issues have caused the Bank to file inaccurate and misleading call reports. In other words, the FDIC's position is that the call reports (which must be filed within thirty days after the end of each quarter) do not accurately reflect the Bank's true financial position.

In support, the FDIC points to bank examiner Boudreau's declaration (portions of which are sealed) stating that the Bank failed to address numerous concerns voiced by the FDIC. According to the FDIC, the call reports at issue are problematic because they mask underlying ALLL reserve issues. The FDIC also contends that deficient call reports prejudice depositors (who can review the reports on-line to obtain information about the Bank) because call reports are "one of the best tools for the public to use in ascertaining the financial condition of banks." (FDIC Resp. at 9, Dkt. 28.) The Bank, on the other hand, contends that it is litigating the propriety of its accounting methodology in the underlying proceedings and that call reports are "simply a matter of paperwork." (Pl. Reply at 10, Dkt. 25.)

The temporary cease-and-desist order requires the Bank to send a copy of that order to its shareholders within sixty days after it is issued. (Compl. Ex. A at ¶ 4, Dkt. 1.) Shareholders will, therefore, be aware of the provisions in the order, which at this time, include the FDIC's position regarding alleged issues with the September and December 2014 call reports and a requirement that the Bank follow the FDIC's methodology moving forward. Call reports serve the laudable purposes of informing the public and ensuring that ALLL reserves are sufficient.

*See In the Matter of * * * Bank*, 1986 WL 379682, at *15. As such, they are not mere "paperwork."

"Unsafe and unsound banking practices are defined as 'conduct deemed contrary to accepted standards of banking operations which might result in abnormal risk or loss to a banking institution or shareholder.'" *Nw. Nat'l Bank, Fayetteville, Ark. v. U.S. Dept. of the Treasury Office of the Comptroller of the Currency*, 917 F.2d 1111, 1115 (8th Cir. 1990) (quoting *First Nat'l Bank v. Dep't of the Treasury*, 568 F.2d 610, 611 (8th Cir. 1978)). Filing an inaccurate call report is "an unsafe and unsound banking practice." *Id*. at 1117. "[E]ven where a bank's officials reasonably (but erroneously) believed the allowance for losses was accurate, misstatement of that figure in a call report . . . . supports the issuance of a cease and desist order." *Id*. In this case, however, the Bank challenges a *temporary* cease-and-desist order and is defending its accounting methodology in two administrative proceedings, both of which are pending.

The court agrees with the Bank that with respect to the September and December 2014 call reports, the FDIC has not explained why the purposes of § 1818(c)(1) can be achieved only by amending these reports at the temporary cease-and-desist stage. Instead, the FDIC simply explains why, in its view, these call reports are inaccurate. It would be helpful to hear argument from both sides on this issue to aid the court in determining if amending these call reports is likely to prevent "insolvency or significant dissipation of assets or earnings," weaken the Bank, or otherwise prejudice the interests of the Bank's depositors prior to the completion of the underlying administrative proceedings. *See* 12 U.S.C. §1818(c)(1).

Turning to the forward-looking reports, the FDIC again argues that the Bank's methodology is improper. In contrast, the Bank argues that there is no reason to impose this condition as part of the temporary cease-and-desist proceedings and that requiring it to follow the FDIC's methodology while the two sets of underlying administrative proceedings are still pending will cause it to suffer irreparable harm because it will act as a waiver of its position regarding the proper methodology. In addition, the Bank contends that the methodology mandated by the FDIC could cause it to be placed into receivership because it would affect the Bank's representations about its capitalization. The Bank also characterizes the FDIC's concerns about the call reports as disingenuous, arguing that the FDIC has challenged call reports dating back to September 2014 but only recently issued the temporary cease-and-desist order.

As detailed in the declarations submitted in support of its opposition to the Bank's motion for a TRO or a preliminary injunction, the FDIC has investigated the Bank and appears to have an extensive amount of information about its condition. It is the FDIC's view that it is important for the call reports to reflect what the FDIC believes are the correct figures relating to the ALLL reserves. Because ALLL reserves are tied to the figures in the call reports, the changes to the next report specified in the temporary cease-and-desist order ("$1,956,00 in provisions to the ALLL" and a "$102,00 reversal of interest income inappropriately recognized for loans that were inappropriately accruing interest," Compl. Ex. A at ¶ 2, Dkt. 1) appears to be meant to affect the amount of ALLL reserves held by the Bank. It is unclear, however, if any potential changes to the ALLL reserves based on the amendments demanded by the FDIC would take place before the underlying FDIC administrative proceedings are over or what actions the

Bank would or could take regarding ALLL reserves if the Bank prepared its next call report under protest using the FDIC's methodology.

The Bank also expresses concern that the FDIC's methodology could result in its being placed in receivership due to changes in its reported capitalization. In response, the FDIC represents that it – not the IDFPR – determines if a bank is critically undercapitalized (the event that determines if a receiver must be appointed). (FDIC Resp. at 16, Dkt. 28.) The FDIC also states that it will not assert that the Bank voluntarily waived its position on the ALLL reserves or capitalization issues, and thus will not use call reports following the FDIC's methodology to subject the Bank to the automatic appointment of a receiver. (*Id*.) Thus, this concern does not rise to the level of irreparable harm.

Next, the Bank correctly notes that the FDIC's representations about waiver do not respond to all of its concerns as the FDIC does not control the IDFPR, which – like the FDIC – is currently involved in administrative proceedings with the Bank. To the extent that the Bank is concerned about waiver, it could note that it is amending its reports or preparing new reports using a different methodology under protest and pursuant to a temporary cease-and-desist order issued by the FDIC. Thus, it does not appear that preparing the call reports under protest as specified by the FDIC would negatively impact the Bank in the IDFPR proceedings.

The Bank's last argument about the call reports is that the FDIC's delay prior to the filing of the temporary cease-and-desist order shows that the FDIC's demands regarding the call reports are baseless. Sealed portions of the FDIC's filings indicate that the FDIC did not, as the Bank suggests, sit idly by despite being aware of the issues identified in the temporary cease-

and-desist order. Instead, the FDIC unsuccessfully tried to work with the Bank prior to initiating proceedings under § 1818(c)(1).

In the end, though, the only specific and ascertainable benefit of changing the reporting methodology in the forward looking reports appears to be that the changes will, according to the FDIC, promote the public's interest in being able to review the FDIC's desired information when making banking decisions. By itself, this benefit does not support the drastic action of requiring the Bank to change its call reports in the short term, before the underlying administrative proceedings are resolved. There may be other purported benefits, but the FDIC's written submissions do not clearly identify them. The court believes that oral argument on this issue would be helpful and, therefore, reserves ruling on the issue of amending the call reports.

C. **The Condition Requiring the Bank to Obtain FDIC Approval Prior to Certain Transactions – Irreparable Harm**

Next, the Bank argues that to the extent that the court finds that the temporary cease-and-desist order is appropriate, it is overbroad and will hinder the Bank's ability to conduct business and earn income because it (1) gives the FDIC the unfettered discretion to approve transactions with no reasonableness standard and (2) does not contain a timeliness requirement. The Bank concludes that "[t]here is simply no reason to not include some timeliness and reasonableness components to any such approval process, and the FDIC does not even attempt to offer any such reason." (Pl. Reply at 10, Dkt. 25.)

In response, the FDIC states that on April 2, 2015 (a Thursday), it responded promptly to the Bank's first group request for approval (sent via email on Saturday, March 28, 2015, and Sunday, March 29, 2015) by stating that it required additional information, and that the Bank to date has not provided that information. (Van Vickle Decl. at ¶ 12, Dkt. 28, Ex. A.) The court

has reviewed the FDIC's proffered rationale for denying approval (which is sealed, *id*. at ¶ 12). It finds that the FDIC's response appears to be financially prudent and was made in a reasonable number of days after receiving the Bank's request.

With respect to any resubmission of the requests that the FDIC denied without prejudice and any additional requests for approval, the FDIC contends that it has and will continue to follow prudent lending practices and will act promptly upon receiving requests to approve loans. Specifically, FDIC Assistant Regional Director Van Vickle represents that:

> The FDIC is prepared to respond in a prompt manner to the Bank's lending requests as required by the Temporary Order. However, the Bank must supply sufficient information in support of the lending requests in order for the FDIC to properly evaluate the requests. The Bank's requests should include the specific rationale underlying the lending request and why the FDIC should approve the Bank's request for extensions of credit of any type. Each request should clearly indicate that the Board of Directors has approved the recommendation by signing loan presentation forms prior to submitting the request to the FDIC.
>
> Extensions or renewals of existing loans are acceptable when based on recent, satisfactory performance and documented ability to pay, and when structured in accordance with the purpose of the credit. Additionally, extensions should be presented to and voted on by the Bank Board of Directors in the same manner as new loans.

(*Id*. at ¶¶ 14-15.)

The Bank's challenge to the prior approval provision in the temporary cease-and-desist order is not grounded on any evidence that demonstrates a reasonable likelihood that the Bank's concerns about the FDIC's commitment to act in a prompt and financially prudent manner will come to fruition. Instead, the Bank claims that "*if* . . . approvals are not timely reviewed or are unreasonably withheld," it "*could* be precluded from generating additional income for the entirety of the administrative action. (Pl. Memo. at 19, Dkt. 29) (emphasis added). This argument is speculative, especially in light of the FDIC's explanation for its rejection of the

Bank's first group request for approval. *See Intertek USA Inc. v. AmSpec, LLC*, No. 14 CV 6160, 2014 WL 4477933, at *8 (N.D. Ill. Sept. 11, 2014) (finding that the plaintiff's argument about potential future harm was "unduly speculative and ultimately unconvincing").

To sum up, the court reserves ruling on the propriety of the portions of the temporary cease-and-desist order relating to call reports. Otherwise, "a factual and statutory basis" supports the FDIC's actions, *Hamilton Bank*, 227 F. Supp. 2d at 8; the notice of charges and the allegations in the temporary cease-and-desist order support the issuance of temporary relief pursuant to § 1818(c)(1); and the FDIC has shown that the order (except the portions addressing call reports) is necessary to prevent or remedy insolvency or asset dissipation. *See* 12 U.S.C. § 1818(c)(1). Thus, setting the issue of the call reports aside until oral argument is held, the Bank has not shown a likelihood of success or irreparable harm with respect to its challenge to the temporary cease-and-desist order.

## IV. CONCLUSION

Plaintiff Edgebrook Bank's motion for a temporary restraining order and preliminary injunction [11] remains under advisement. The court reserves ruling on the Bank's challenge to the portion of the temporary cease-and-desist order addressing modifications to the Bank's past and future call reports as it believes that oral argument on this issue would be helpful. Counsel shall jointly contact the clerk to schedule a date for oral argument, which will be held on the earliest possible date. Arguments shall not exceed 45 minute per side. The court believes that the parties' presentations would be most helpful if the FDIC argued first, providing its justification for requiring amendment of the September and December 2014 call reports and the

utilization of its methodology moving forward. The FDIC may reserve a portion of its time for reply.


Date:   April 28, 2015                                  /s/
                                                Joan B. Gottschall
                                                United States District Judge